KING, Circuit Judge,
dissenting:
With the utmost respect for my distinguished colleagues in the majority, I dissent from them decision to permit the plaintiffs to attempt to hold the arresting deputies and their immediate supervisor *277 individually liable at trial for the botched arrest at the funeral home. No reasonable jury could conclude from the record on summary judgment that these defendants acted with the requisite malice such that their entitlement to the immunity routinely afforded public officials under North Carolina law ought to be abrogated. Perhaps more importantly, and no matter the deputies’ subjective intentions toward GT Russ III (“Mr. Russ”) in taking him into custody, there is simply no evidentiary basis to deduce that they meant any harm whatsoever to the plaintiffs.
The majority’s analysis correctly focuses on the question of malice; there is no legitimate allegation that, in arresting Mr. Russ, the deputies were corruptly influenced or undertook an act outside their job description. See Grad v. Kaasa, 312 N.C. 310, 321 S.E.2d 888, 890 (1984) (“As long as a public officer lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption, he is protected from liability.”). There is likewise no indication that, in performing their jobs, the deputies lacked probable cause to arrest Mr. Russ or that they were without legal entitlement to park at the funeral home and traverse its grounds.
The execution of the arrest warrant was indisputably tactless and clumsy. In denying the deputies summary judgment on the individual-capacity claims, the district court went farther, observing that the plaintiffs “put forward sufficient evidence of extreme and outrageous conduct and reckless indifference.” Russ v. Causey, 732 F.Supp.2d 589, 613 (E.D.N.C.2010). Even if one concurs in the court’s characterization, the difficulty with its ruling is that neither “extreme and outrageous conduct” nor “reckless indifference” equates to malice under North Carolina law.
“Extreme and outrageous conduct” is an element of a claim for intentional infliction of emotional distress, but the term merely describes the necessary predicate act. See Johnson v. Antioch United Holy Church, Inc., 714 S.E.2d 806, 811 (N.C.Ct.App. 2011) (reciting essential elements of claim as “(1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress” (citation and internal quotation marks omitted)). The conduct alone is not actionable unless accompanied by a particular mental state, i.e., the intent to inflict a cognizable psychic injury upon the plaintiff, with the result that such injury consequently occurs.
“Reckless indifference,” on the other hand, does describe a mental state — one that is potentially actionable in many contexts — but one that falls short of the rigorous threshold for malice. Indeed, the North Carolina courts have squarely held that “[a] plaintiff may not satisfy this burden [of showing malice or corruption] through allegations of mere reckless indifference.” Schlossberg v. Goins, 141 N.C.App. 436, 540 S.E.2d 49, 56 (2000). A public official “acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another.” Grad, 321 S.E.2d at 890 (citation omitted). A “wanton” act is one “done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others.” Id. at 891 (citation omitted).
A considered reconciliation of the above excerpts from Grad reveals that a wanton act, even one tending less toward wicked and more toward needless (from which a general state of reckless indifference might be inferred), is, standing alone, in *278 sufficient to establish malice. Such an act must also be objectively contrary to the officer’s duty and target a specific person for detriment.[1] Thus, although the deputies may have callously and boorishly invaded the solemnity of the funeral proceedings, it does not follow that their zeal translated into malice. It is also not determinative that the deputies may have contravened the prescribed arrest procedure by neglecting to identify themselves prior to engaging Mr. Russ. The majority elevates this technical breach to the violation of a statutory duty, see ante at 17-18, but even assuming the correctness of the majority’s position, it was a violation without meaning in this case.
The fracas did not occur because the deputies failed to identify themselves; it occurred because Mr. Russ, without cause, vigorously resisted arrest. The record conclusively establishes that Mr. Russ is, without question, a scofflaw who, over the years, has made a habit of evading capture.[2] In this particular instance, Mr. Russ was well aware that the Sheriffs Office possessed a warrant for his arrest. Five days before the funeral, Mr. Russ barricaded himself inside his parent’s house to keep from being arrested, and, two days after that, broke a promise to turn himself in. There can be no credible contention that Mr. Russ did not understand perfectly well who was accosting him at the funeral home, notwithstanding that he may not have been personally acquainted with the arresting deputies. See N.C. GemStat. § 15A-401(c)(2) (disposing of identification requirement if arresting officer’s “identity is otherwise apparent”).[3] Furthermore, under the circumstances present here, whatever duty the deputies might have short-circuited by virtue of their subterfuge was countermanded by their overriding duty to take Mr. Russ into custody before he could leave the jurisdiction. See State v. Harvey, 281 N.C. 1, 187 S.E.2d 706, 712 (1972) (“When a warrant ... is placed in the hands of an officer for execution, it is his duty to carry out its demands without delay, and he incurs no *279 liability for its proper execution, however disastrous may be the effect on the person against whom it is issued.”)- That duty the deputies fulfilled, albeit inelegantly.[4]
Perhaps more importantly for the purposes of our analysis, any injury or prejudice that the deputies may have intended by virtue of them actions was directed solely at Mr. Russ. There is no indication in the record of any animosity or ill-will between the deputies and the plaintiffs. See J.A. 379, 596 (documenting plaintiffs’ deposition admissions that defendants bore them no personal animus). To the contrary, all indications are that the Sheriffs Office extended the plaintiffs every consideration and courtesy throughout the days leading up to the incident and beyond. See id. at 76 (memorializing Deputy Gonzalez’s condolences to Peggy Russ on her husband’s death and forgoing confrontation concerning her son’s whereabouts); id. at 145 (setting forth Chief Deputy McMahon’s accession to Peggy Russ’s pleas to stay away from residence during mourning period); id. at 369 (acknowledging McMahon’s apology to plaintiffs).
The majority pays little heed to the targeting requirement, suggesting that the deputies’ timing of Mr. Russ’s arrest arguably “demonstrates an intent to injure him, his family, and anyone else at the funeral grieving the decedent’s death.” Ante at 22. The majority’s supposition finds no support in North Carolina law, and it in fact appears to be an attempt to engraft the negligence concept of foreseeability (which usually circumscribes the contours of duty and damages) onto a very different type of claim, the successful prosecution of which has heretofore required a specific malevolent or uncaring intent on the part of the defendant.[5] This unwarranted expansion of the universe of potential plaintiffs is also in contravention of the state’s statutory scheme regarding the award of *280 punitive damages in cases where the defendant has acted maliciously. See N.C. Gen.Stat. § ID-15 (a)(2). In such instances, the plaintiff must prove malice “toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant.” Id. § lD-5(5) (emphasis added). Here, the record is clear that, when the commotion began, the plaintiffs were in a limousine waiting for the procession to the gravesite to commence. That they had to exit their vehicle and walk around the building to see what was happening belies the conclusion that the deputies intended them any harm at all.
I would hold that the district court erred in withholding public officials immunity from the arresting deputies and their supervisor, and I would reverse the denial of summary judgment on that basis. I would remand with instructions to grant summary judgment to all defendants as to the entirety of the plaintiffs’ action, including the negligence claims, concluding that as distasteful as the entire episode undoubtedly was, the defendants owed no cognizable legal duty to the plaintiffs to refrain from arresting Mr. Russ at the funeral home. Because my good friends in the majority disagree and will allow this matter to proceed to trial, I respectfully dissent.

. The majority errs in overemphasizing the initial component of the Grad framework, making the unjustified logical leap that "[w]hen the definition of 'wanton' is grafted into the definition of ‘malice,’ " ante at 16, the incorporation within wantonness of an inchoate aura of reckless indifference is determinative of malice if a police officer is found to have breached any duty (not necessarily one related to the alleged injury) and intends to harm or injure any person (not necessarily the plaintiff). See id. at 17-22. The majority's approach, in effect, squarely contravenes the admonition in Schlossberg that the conduct of police officers in the field be evaluated under the rigorous causal and targeting requirements accompanying the malice standard, and not under the more amorphous, less accommodating reckless indifference standard.

. For example, Deputy Mario Gonzalez filed an uncontested declaration that "Mr. Russ ... was known within the New Hanover County Sheriff's Office to be an elusive individual who could be very difficult to locate and apprehend.... On repeated occasions, he had promised me over the telephone that he would turn himself in, but he invariably failed to do so.” J.A. 70 (citations herein to "J.A. _” refer to the contents of the Joint Appendix filed by the parties to this appeal).

.The plaintiffs' own witness, Ronald Simmons, submitted an affidavit that Mr. Russ, prior to being subdued, acknowledged that the men engaging him were police officers by stating that "I had permission to turn myself in.” J.A. 833. That the bystanders were momentarily at sea concerning the deputies' identity is immaterial, as it was solely Mr. Russ who was responsible for escalating the encounter. Mr. Simmons's particular expression of bewilderment: "I thought what was going on was some kind of [Mjafioso type hit,” id., does not exactly inspire confidence in the plaintiffs’ contention that Mr. Russ lacked culpability for the incident.

. Though the majority plainly hangs its hat on the alleged violation of the deputies’ duty to identify themselves, it conflates that supposed misstep with several other actions it considers "brutish and bullying" or otherwise objectionable, ante at 17, to declare that the officers were bound to observe a considerably broader "duty not to engage in extreme and outrageous conduct.” Id. at 18. Such a general mandate might constitute useful public policy in the realm of everyday tort law. It is of limited utility, however, to guide the actions of police officers, who routinely fulfill their duties by lawfully engaging in conduct that would be considered extreme if done by an ordinary citizen. Tellingly, none of the cases cited by the majority as establishing a special legal status for funerals and burials, see ante at 19-20, remotely involved police conduct, and none have discussed the need for balancing society’s interest in the solemnity of death rituals with the countervailing interest in the effective execution of criminal justice.

. The majority cites Prior v. Pruett, 143 N.C.App. 612, 550 S.E.2d 166 (2001), for the uncontroversial proposition, echoed in Schlossberg, that "generally, claims of negligence can not be maintained against public officials in their individual capacity, [but] these actions may be maintained if plaintiffs bring forth evidence sufficient to pierce the cloak of official immunity.” Id. at 171 (citation and internal quotation marks omitted). It was probably no accident that the court in Prior distinguished between "claims of negligence” and "these actions." An action arises out of a specific occurrence or set of circumstances that, under the applicable law, may engender myriad claims supporting the imposition of liability. When it is demonstrated that a defendant public official has acted culpably enough to pierce the cloak of immunity, the plaintiff no longer has a claim for ordinary negligence; instead, the claim is for an intentional tort (assault and battery in Schlossberg, and here, infliction of emotional distress) or some functional equivalent. Indeed, the denial of summary judgment to the police defendants in Prior was based on the court's determination that genuine issues of material fact remained with respect to the officers' allegedly wanton conduct and gross negligence. See id. at 171-72, 174.